*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STACEY LYNN CAMMENGA, also known as
STACEY LYNN TIMMER,

UNPUBLISHED
April 25, 2024

        Plaintiff/Counterdefendant-
        Appellee/Cross-Appellant,

v

No. 358463
Barry Circuit Court
LC No. 2020-000233-DO

MICHAEL PHILIP CAMMENGA,

        Defendant/Counterplaintiff-
        Appellant/Cross-Appellee.

AFTER REMAND

Before: M. J. KELLY, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

This divorce litigation between plaintiff/counterdefendant, Stacey Cammenga, and defendant/counterplaintiff, Michael Cammenga, returns to this Court after a remand to the trial court to make necessary factual findings related to the value of a tax loss carryforward, to alleged violations of a status quo order, and to the court's decision to award attorney fees to Stacey. For the reasons stated in this opinion, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BASIC FACTS

The facts are set forth in our prior opinion:

The parties married in October 1992 and have two adult children. During the marriage, Michael worked at various jobs in the paper industry. The parties lived in several states during the marriage, and Michael sometimes lived separately from Stacey and the children. Michael was the primary breadwinner, whereas Stacey was primarily responsible for the home and childrearing. In 2018, Michael started a business, Cammenga Investments, LLC, which he used—in partnership

-1-

with other entities that he had an interest in—to purchase a papermill. In March 2020, after discovering that Michael was having an affair with an employee of the papermill, Stacey filed a complaint for divorce. Michael filed a counterclaim for divorce.

The divorce was contentiously litigated. Relevant to the issues raised on appeal, the trial court entered a status quo order that limited the parties' spending to their past practices and prohibited Michael from spending money on the woman identified as his mistress. Both parties presented evidence indicating that the other had violated the status quo order, and the trial court eventually determined that their spending in violation of the order resulted in a "wash" so there was no need to credit either party for the other's improper spending. There was also extensive pretrial litigation related to Michael's untimely and incomplete responses to discovery requests. The court ultimately sanctioned Michael by prohibiting the use of documentation that he had not provided to Stacey. Additionally, after the court ordered Michael to pay temporary spousal support, he moved to modify the amount owed based on a purported decrease in his monthly income from $10,000 to $2,500. The trial court denied his request after determining that Michael lied about the decrease in his income.

Following a three-day bench trial, the court placed detailed findings on the record addressing numerous issues related to the parties' assets, the division of the martial [sic] estate, spousal support, and Stacey's requests for attorney fees. Thereafter, in response to motions for reconsideration and clarification, the court placed additional findings on the record. [*Cammenga v Cammenga*, unpublished per curiam opinion of the Court of Appeals, issued March 23, 2023 (Docket No. 358463), pp 1-2.]

In the prior appeal, we determined that the trial court had correctly found that a $2,255,757 tax loss carryforward was a marital asset, but that the trial court had erred by assigning it no value. *Id*. at 8-9. For that reason, we remanded with directions for the trial court to, "on the existing record, determine the value of the carryforward and readjust the property division to compensate Stacey accordingly." *Id*. at 9. Next, although we affirmed the trial court's finding that Michael had improperly spent money on his mistress in violation of the status quo order, we noted that the trial court had failed to make findings as to whether certain of Stacey's expenditures violated the status quo order. *Id*. at 12-13. As a result, we remanded to the trial court to determine "on the existing record" whether Stacey dissipated assets or violated the status quo order or both. *Id*. at 13. Finally, we found that additional findings were necessary with regard to whether the trial court properly awarded Stacey $20,000 in attorney fees. We concluded that the trial court had failed to make findings as to whether Stacey was entitled to need-based attorney fees under MCR 3.206(D)(2)(a). Further, we explained that, although the court properly found that attorney fees were warranted under MCR 3.206(D)(2)(b) as a result of Michael's obstructionist behavior during discovery, the trial court failed to make findings as to the amount of attorney fees and expenses that were incurred as a result of Michael's bad behavior. *Id*. at 17-18. Finally, we noted that the court also failed to make any findings as to the reasonableness of the attorney fees requested. *Id*. at 18. We directed the trial court to make the requisite findings on remand. *Id*. at 18.

The trial court held two hearings on remand and made some of the necessary factual findings. At the end of the first hearing, the court accepted a stipulation by the parties to reopen the proofs to allow expert testimony on the value of the tax loss carryforward. However, the court subsequently reconsidered its decision to reopen the proofs and determined that, in accordance with this Court's order, it would not be appropriate. Thus, the court stated that it would make its findings based upon the existing record. The court made the remaining factual findings at the second hearing. It then entered an amended order distributing the parties' property. This appeal follows.

## II. TAX LOSS CARRYFORWARD

### A. STANDARD OF REVIEW

A trial court's valuation of marital assets is reviewed for clear error. *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id*.

### B. ANALYSIS

#### 1. STIPULATION TO REOPEN THE PROOFS

Michael first argues that the trial court erred by setting aside the parties' stipulation to reopen the proofs. We disagree. "It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court." *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 544-545; 705 NW2d 365 (2005) (quotation marks and citation omitted). Thus, "when an appellate court gives clear instructions in its remand order, it is improper for a lower court to exceed the scope of the order." *Id*. at 544. Accordingly, the trial court did not err by adhering to clear directive that the valuation of the tax loss carryforward be determined based upon the existing record.

#### 2. EXPANSION OF THE RECORD ON APPEAL

At trial, Michael did not present any evidence as to the value of the tax loss carryforward. He attempts to do so on appeal by presenting documentary evidence from a certified public account, who opined that Michael improperly prepared his prior tax records and that the actual value of the tax loss carryforward is $161,965. However, the proceedings on remand were limited to the existing record. Further, Michael has not sought leave to expand the record on appeal to include the new documentary evidence. See *Killmer v Sabourin*, 499 Mich 852, 852; 873 NW2d 314 (2016) (A party may not "expand the record without first having moved to do so."). We, therefore, decline to consider it.[1]

---

[1] We note that Michael did not submit an affidavit indicating that he had amended his tax returns to correct the alleged error, nor has he submitted a copy of his amended tax returns as evidence that the tax loss carryforward is $161,965 instead of $2,255,757.

### 3. VALUATION METHODS ARGUED AT HEARING ON REMAND

On remand, the parties and the trial court considered different methods by which to value the tax loss carryforward on the existing record. Michael, however, asserts that the parties struggled with the remand directions "because the existing record was insufficient to place an accurate value on the tax carryforward loss." We disagree. Indeed, the existing record permits for the tax loss carryforward to be calculated using various methods.

First, considering the existing record, Michael's tax returns reflected that the value of the tax loss carryforward was $2,255,757. Moreover, at trial, Stacey presented testimony from a certified public accountant who testified as to the nature of the carryforward and how to determine its value. As we noted in our prior opinion:

> the accountant testified that the value of the carryforward could be determined by calculating Michael's taxes each year and to ascertain how much he saved as a result of the carryforward. This would involve looking at Michael's income, determining his tax bracket and any deductions first, and then calculating the tax that he would owe but for the carryforward. [*Cammenga*, unpub op at 8.]

Based upon the accountant's testimony, it is clear that the value of the tax loss carryforward is the annual tax benefit that will inure to Michael annually until the approximately $2.2 million carryforward has been exhausted. The only question remaining for the trial court was how to calculate that tax benefit in a fashion that would allow for it to be distributed as part of the property settlement.

In our prior opinion we suggested that, based upon the accountant's testimony, "a portion of the tax loss carryforward's value could be allocated to Stacey by ordering Michael to annually pay Stacey an amount equal to 60% of his tax savings attributable to the carryforward." *Id*. However, when the trial court attempted to use this valuation method, Michael's lawyer objected, and Stacey's lawyer expressed concerns regarding the anticipated difficulty in obtaining Michael's tax returns on an annual basis. Ultimately, the trial court declined to use this method of valuation.

This method, however, was—and remains—a permissible method of valuing the tax loss carryforward. First, there is no prohibition on the trial court entering orders that will require future disclosures by the parties. See, e.g., *Hodge v Parks*, 303 Mich App 552, 562; 844 NW2d 189 (2014) (approving a 2011 property division that, among other things, required the husband to "thereafter submit his personal and business income tax returns in 2012, 2013, and 2014 to show whether the business improves"). Second, we reject Michael's argument that calculating the value of the tax loss carryforward based upon his future tax returns will impermissibly allow Stacey to benefit from his future earnings. Michael directs this Court to *Skelly v Skelly*, 286 Mich App 578; 780 NW2d 368 (2009) as support for his argument. In *Skelly*, this Court held that a wife was not entitled to a percentage share of her ex-husband's future employment bonuses because the bonuses "were not earned during the marriage and are based solely on the potential occurrence of future events unrelated to the marriage." *Id*. at 584. *Skelly* is inapposite to this case, however.

Here, the $2,255,757 tax loss carryforward was earned during the marriage as a result of business losses that occurred during the marriage. The fact that the value of this marital asset

cannot be calculated without considering—in some form—Michael's future earnings does not transform the tax loss carryforward into a post-marital asset. Rather, the only impact Michael's future earnings have on the value of the tax loss carryforward is to reduce it by the amount of taxes owed each year. Stated differently, his future earnings only have the potential to vary the amount of tax benefit that he may recognize as a result of the carryforward from year to year. Merely considering the impact his future income will have on the realized value of the tax loss carryforward on an annual basis is not impermissible. Accordingly, the trial court would not have erred by using this method of annually distributing the $2,255,757 value of the tax loss carryforward.[2]

Next, Michael suggests that the tax loss carryforward can be calculated by ordering the parties to file joint tax returns.[3] A trial court has discretion to compel the parties to a divorce to file a joint tax return "when, under all the circumstances, it is in the best interests of the marital estate, and . . . there is (1) no ability for the court to make up the difference in tax liability through an allocation of property, (2) there is no history of tax problems with the requesting spouse, (3) the parties have a history of filing joint tax returns during the marriage, and (4) the court orders the spouse (absent an agreement to do so) to indemnify and hold harmless the reluctant spouse for any resulting tax liability." *Butler v Simmons-Butler*, 308 Mich App 195; 863 NW2d 677 (2014). Michael suggests that Stacey would "be indemnified from any resulting tax liability." Nevertheless, we question whether such an approach would be advisable in this case in light of the prior history. As the trial court found repeatedly throughout the proceedings, Michael "has shown a willingness and ability to lie and hide income." Moreover, given his obstructionist behavior during discovery, it is unlikely that he would timely cooperate with Stacey in preparing a joint return. As a result, it is not clear to this Court that a joint tax return would be more appropriate in this case than ordering Michael to annually produce his tax return to Stacey so that the yearly benefit of the tax loss carryforward could be properly apportioned.

## 4. VALUATION METHOD SELECTED BY THE TRIAL COURT

The trial court did not use either of the above methods to distribute the value of the tax loss carryforward. Rather, it determined—correctly—that the value of the tax loss carryforward was the future tax benefit to Michael. That is, as the accountant testified, Michael would not have to pay taxes on his income until such time as the $2,255,757 in tax losses had been exhausted. In light of Michael's annual income, the trial court recognized—albeit indirectly—that the benefit

---

[2] Again, we recognize that the trial court is reluctant to use this method of calculation as a result of the immense difficulty that has been encountered in obtaining financial information from Michael throughout the divorce proceedings. We note, however, that the trial court retains the discretion to employ "its contempt power to coerce compliance with a present or future obligation or to reimburse the complainant for costs incurred by the contemptuous behavior, including attorney fees[.]" See *Porter v Porter*, 285 Mich App 450, 456; 776 NW2d 377 (2009).

[3] Filing a joint tax return to calculate the annual value of the tax loss carryforward is a method that can be used based upon the existing record. As a result, we find disingenuous Michael's protestations that the existing record is somehow insufficient for the tax loss carryforward to be valued.

would not be exhausted during a single year. Accordingly, the trial court attempted to ascertain the value of Michael's tax benefit as a result of the carryover for the next 18.5 years, i.e., until he attained the age of 70. To do so, the court looked to Michael's tax records and determined that he was in the 24 percent tax bracket. The court then calculated that 24% of the tax loss carryforward was $541,321. From there, the court determined that Stacey's 60% share of the $541,321 would be $324,829. Because Michael would not realize the full benefit of the tax loss carryforward in a single year, the court ordered Michael to pay Stacey either annually or monthly until he turned 70 years of age.

We conclude that the trial court erred by valuing the tax loss carryforward in this manner. Reducing the $2,255,757 value of the tax loss carryforward by 24% did not result in a determination of the money Michael would "save" by not having to pay taxes on an annual basis. Rather, the only way to make such a determination would be to apply the tax rate to his income, not to the value of tax loss carryforward. The trial court's factual findings are clearly erroneous because the court improperly applied the tax percentage rate to the value of the tax loss carryforward instead of applying it to Michael's annual income. A second remand is, therefore, required.

On remand, the trial court shall make a finding as to the value of the tax loss carryforward and shall distribute 60% of that value to Stacey. On remand, the trial court may proceed upon the existing *adequate* record. The trial court is not precluded from ordering the asset to be valued by requiring Michael to annually produce his tax return so that amount of the carryforward can be calculated on an annual basis. Likewise, although it seems unwise given that the trial court did not clearly err by finding that Michael has a history of dishonesty related to his income, the court is not precluded from considering whether it would be more appropriate to order the parties to file a joint return. Finally, the court may also value the tax loss carryforward by using Michael's tax returns that have been included in the lower court record to estimate the amount of money that he will not have to pay as a result of the tax loss carryforward until he attains the age of 70. Although such a calculation would result only in an estimate, not a precise value of Michael's annual tax benefit as a result of the carryforward, mathematical precision is not required when dividing an asset because the "goal is to fashion a fair and equitable division of property in light of all the circumstances." See *Pelton v Pelton*, 167 Mich App 22, 26; 421 NW2d 560 (1988) and *Thames v Thames*, 191 Mich App 299, 309; 477 NW2d 496 (1991).

Alternatively, if the trial court desires additional testimony regarding the value of the tax loss carryforward, the court may appoint its own disinterested expert to offer an opinion on value. See *Olson v Olson*, 256 Mich App 619, 627 n 4; 671 NW2d 64 (2003).[4] Moreover, if the expert requires additional information from the parties for a proper determination, the trial court should order the parties to produce same. The court may order one or both of the parties to bear the expense of such an expert.

---

[4] The parties already had the opportunity to present testimony on the value of the tax loss carryforward at trial. Stacey availed herself of that opportunity by presenting testimony from a certified public accountant. Michael did not, however, present any testimony. That was his choice.

### III. VIOLATION OF THE STATUS QUO ORDER

#### A. STANDARD OF REVIEW

Next, Michael argues that the trial court's finding that Stacey did not violate the status quo order is against the great weight of the evidence. At the outset, we reject Michael's contention that the great weight of the evidence standard is applicable here. The case he cites for that proposition, *Phillips v Jordan*, 241 Mich App 17, 20; 614 NW2d 183 (2000), addresses the standard of review applicable to *custody* decisions. Given that the issue on appeal does not relate to custody, we review the court's factual findings for clear error. *Hodge*, 303 Mich App at 554-555. ). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made." *Id*. at 555 (quotation marks and citation omitted).

#### B. ANALYSIS

The trial court found that Stacey did not violate the status quo order by giving the parties' adult son approximately $33,000. In support, Michael directs this Court to his trial testimony indicating that he did not agree with providing their adult son with a credit card during the marriage, that he did not approve their son's use of the credit card after he dropped out of college, and that his son was using the credit card to purchase drugs, car washes, and to "eat out" excessively. He complains that the court did not credit his testimony. Yet, on remand, rather than credit Michael's testimony, the court found credible the trial testimony from Stacey and from the parties' son that the spending was consistent with past practices. The trial court did not clearly err by finding their testimony credible. See *id*. ("Special deference is afforded to a trial court's factual findings that are based on witness credibility."). The court's findings, therefore, are affirmed.

### IV. TAX CONSEQUENCES

Michael next asserts that the trial court did not account for the tax consequences of the property settlement and that, as a result, the marital estate was split 64/36 instead of 60/40 in favor of Stacey. The trial court did not address this on remand because it was not instructed to do so. Specifically, he complains that the court should have considered tax consequences related to his IRA account. He argues that it was permissible for the court to consider it on remand because this Court stated in our prior opinion that "[r]emand for further proceedings related to the overall value of the marital estate are required because the trial court clearly erred by failing to place a value on the tax loss carryforward and because the court failed to make adequate factual findings as to whether Stacey dissipated the marital estate, violated the status quo order, or both." *Cammenga*, unpub op at 13-14. Our directive was in light of Stacey's argument that there were mathematical errors in the property distribution that resulted in the split being less than 60/40. *Id*. at 13. Recognizing that the "court's findings on remand related to both of those issues has the potential to affect the overall value of the marital estate," we concluded that "any mathematical errors in the court's distribution [could] be addressed on remand." *Id*. at 13-14. Michael suggests that the remand directive gave the trial court carte blanche to reconsider every aspect of the property distribution, including the tax consequences related to his IRA. We disagree. Remand was limited to correcting mathematical errors and to considering the potential impact of the court's findings related to the tax loss carryforward and the alleged violation of the status quo order. Consequently, we decline to consider this issue as it is outside the scope of the remand order. See *K & K Const,*

*Inc*, 267 Mich App at 544. Moreover, if Michael wished to raise an argument related to the tax consequences to him as a result of him being awarded his IRA, he could have attempted to do so in his prior appeal. He did not.

## V. ATTORNEY FEES

### A. STANDARD OF REVIEW

The trial court originally awarded Stacey $20,000 in attorney fees. On remand, the trial court awarded her $46,340 in attorney fees. Michael argues that the court's decision was an abuse of discretion. This Court reviews a trial court's decision whether to award attorney fees for an abuse of discretion. *Cassidy v Cassidy*, 318 Mich App 463, 479; 899 NW2d 65 (2017). "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Id.* Factual findings are reviewed for clear error. *Id.* "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks and citation omitted).

### B. ANALYSIS

The court awarded attorney fees under MCR 3.206(D)(2), which provides:

> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

> (a) the party is unable to bear the expenses of the action, including the expense of engaging is discovery appropriate for the matter, and that the other party is able to pay, or

> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

On appeal, Michael challenges the court's findings that need-based attorney fees were warranted under MCR 3.206(D)(2)(a) and its findings that attorney fees were warranted under MCR 3.206(D)(2)(b) as a result of his misconduct. We address each argument in turn.

In our prior opinion, we concluded that the trial court did not clearly err by finding that attorney fees were warranted under MCR 3.206(D)(2)(b) as a result of Michael's obstructionist behavior. *Cammenga*, unpub op at 17-18. However, we remanded for the court to make a finding as to the amount of fees that Stacey incurred as a result of Michael's bad behavior. *Id.* at 18. We explained that to be awarded attorney fees under MCR 3.206(D)(2) "the bad behavior must have caused the incurrence of the fees and expenses." *Id.* Thus, we directed the court to "more particularly evaluate what attorney fees and expenses Stacey incurred as a result of Michael's bad behavior[.]" *Id.* We also directed the court to consider the reasonableness of the fees before awarding any specific amount of attorney fees. *Id.*

On remand, the trial court again found that fees were warranted as a result of Michael's bad behavior. Furthermore, it made findings as to the reasonableness of the requested attorney

fees. However, the court did not make any findings as to what amount of attorney fees and costs were incurred by Stacey as a result of Michael's bad behavior. Consequently, the court's award of fees under MCR 3.206(D)(2)(b) remains factually deficient.

Michael next asserts that the trial court failed to find that Stacey lacked the ability to pay attorney fees and that he had the ability to pay attorney fees. We disagree.

First, Michael asserts that the court erred by finding that Stacey lacked the ability to pay her attorney fees. In doing so, he suggests that the court should have considered the property awarded to Stacey. The court, however, did consider the property awarded to Stacey. It found that because Stacey had raised the children and taken care of the household, she did not have a retirement. As a result, the court found that she would need the property award to assist her "in the long-haul," not just "the short-term." "It is well established that a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support." *Gates v Gates*, 256 Mich App 420, 438; 664 NW2d 231 (2003). Thus, we discern no error in the court's finding that, notwithstanding the property award, Stacey was unable to pay her attorney fees.

Michael also asserts that the court was required to consider the impact of spousal support on Stacey's ability to pay her attorney fees. The court found that Stacey was in a situation where she did not have adequate funds to pay her attorney fees. The court noted that she had a "budget shortfall." Specifically, the court noted that throughout the course of the marriage, she contributed by taking care of the household and caring for the children. She had an extremely limited work history, which only included briefly working part time. The court found that, at the time of trial, she was working part time and was unable to live independently. Rather, she was living with her parents. The court found that the spousal support award would permit her to live independently.

Overall, the trial court's findings were supported by the record, which reflected that Stacey had a budget short-fall of $1,400 per month, that she was living with her parents, that she had a limited work history as a result of the time she spent during the marriage caring for the household and the children, that she was working part-time, that she had no real retirement assets, and that she required her spousal support to pay her everyday living expenses.

Michael also complains that he did not have the ability to pay $46,340 in attorney fees because his share of the marital estate was miniscule. Yet, the court found that Michael was living with a significant other, with whom he could share his living expenses. Additionally, the record reflects that he was awarded the business, which was an income-producing asset, and he drew a salary from that business. The court found that at the time of trial, Stacey made only one sixth of the amount of Michael's income. Given that he had a significantly larger income, could share his living expenses with his significant other, and had been awarded the income-producing assets, the court did not clearly err by finding that he had the ability to pay Stacey's attorney fees.

Michael next argues that the trial court erred by applying an arbitrary method of determining how much of Stacey's attorney fees that he should be required to pay. The trial court, however, did not make an arbitrary decision. Rather, after it found that the requested attorney fees were reasonable (which is a finding that Michael does not challenge on appeal), the court determined that it would be appropriate to award Stacey less than 100% of the requested fees.

Specifically, it considered that because Stacey's income was one sixth of Michael's income, it would only order him to pay five-sixths of her requested attorney fees. The court's finding was not an abuse of discretion. Instead, it reflected the court's finding that Stacey had some *limited* ability to pay attorney fees, such that an award of 100% of the requested fees was not proper.

In sum, we agree with Michael that the court failed to make sufficient findings under MCR 3.206(D)(2)(b), but we conclude that the award of attorney fees was warranted under MCR 3.206(D)(2)(a), so reversal is not required. Further, we conclude that the court properly considered the reasonableness of the requested fees, and that its decision to ultimately award Stacey five-sixths of the requested fees was not an abuse of discretion.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Neither party having prevailed in full, no taxable costs are awarded. MCR 7.219(A). We retain jurisdiction.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Thomas C. Cameron

# Court of Appeals, State of Michigan

## ORDER

Stacey Lynn Cammenga v Michael Philip Cammenga

Docket No.  358463

LC No.  2020-000233-DO

Michael J. Kelly
Presiding Judge

Kathleen Jansen

Thomas C. Cameron
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The proceedings on remand are limited to the issues specifically addressed in the opinion issued concurrently with this order.

The court may appoint an expert to assist it in valuing the tax loss carryforward.  Should that expert require additional information from the parties for a proper determination of the asset's value, the trial court should order the parties to produce the same.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

April 25, 2024
Date

_____
Chief Clerk